## H. H. HAMIT v. STATE.

No. A-6405. Opinion Filed March 2, 1929.
(275 Pac. 361.)

Bowling & Farmer, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was tried in the district court of Garvin county on a charge of murder and convicted of manslaughter and sentenced to serve a term of six years in the state penitentiary at McAlester.   Motion for new trial was filed, considered, and overruled, exceptions duly saved, and the case appealed to this court.

The testimony on behalf of the state, in substance, is as follows:   Dr. N. H. Lindsay testified as to the effects of the wounds upon the body of the deceased, and stated they were sufficient to produce death.

T. G. Readnour testified he was a brother-in-law of the defendant; that he was a member of the school board of Oak Dale community; that the defendant, Mr. Hamit, the deceased, and Mr. Livingston were also members of

the school board; that he, the deceased, and defendant had always been ordinarily friendly; they were neighbors, close together; that he and defendant went to Pauls Valley on the 3d day of July, 1924, in his wagon; that before they got to town defendant had some whisky, "I judged it to be corn whisky; defendant took a drink out of a quart fruit jar, I also took a drink, and John World took a drink of it; we arrived in Pauls Valley about noon, put up our team, and went up town; I met the deceased at the Farmers' Store, and he asked me if Old Hellcat Hamit was in town, and I told him Hamit was in town, and deceased said, 'let's hunt him up and get this business straightened up.' I did not see anything out of the ordinary in the statement of the deceased; I told him I wanted to go down to Carl Ballard's store a few minutes and I would be back and we could get together pretty soon. When I came up to the Farmers' Store, Mr. Hamit and Mr. Livingston were there; they were on Charles avenue, running east and west by the side of the Farmers' Grocery, when I went up the first conversation I remember, Mr. Livingston said he went to the county superintendent and county attorney, and there was nothing we could do about having the boys arrested who had been tearing up the school property until we located who the boys were that were tearing it up. I do not remember how the deceased was dressed; when I went up deceased and I sit down on some sacks and Mr. Hamit kindly set down in the back of a delivery truck; after we got through with this school business, Mr. Livingston said, 'I know something if I would tell would surprise you,' and Mr. Hamit said, 'Why not tell it, and by God you are not the man you ought to be if you don't tell it.' Mr. Livingston told him it did not pertain to the school business and Mr. Hamit just laughed and said that was all right then; Mr. Livingston said, 'I understand you God damn fellows want me off the school board and I am going to quit,' and Mr. Hamit says, 'No, I don't want you off the board; and

Livingston said, 'You said you did,' and Mr. Hamit said, 'No, I did not say that,' and he said you told Readnour the other day, and he said you were going to resign off the board, and he said, 'I did, you God damn fellows get who you please.' And defendant told him to stop cussing him, he had not done anything, and Mr. Hamit told him to go away and let him alone, that he had tried to start trouble with him a number of times and Mr. Livingston said, 'You God damn you ———.' I did not catch what he said, and they both raised up on their feet at the same time. When Livingston was raising to his feet he said, 'God damn you,' and after he got to his feet, 'God damn you old man, listen,' and defendant was on his feet by that time. I did not see anything in Mr. Hamit's hand when he got up, did not see his knife until after he had done the stabbing; when the deceased told him to listen, defendant told him to go away and leave him alone; they were both using profanity; it looked like Hamit just punched him with his thumb and finger and walked past, and he was right in front of him and just stretched out and punched him, and I seen the knife after he turned around. At the time Hamit punched the deceased with his knife I could not tell what Livingston was doing with his hands; he had some political cards in his hand and was using his hands in making gestures; Livingston did not make any attempt to strike the defendant after the defendant punched him with his knife; at the time this occurred I was about three feet away from Tom (meaning the deceased). When I started off with Livingston across the street to Wright's store, the defendant said he would be there when we got back. He shut up his knife and stuck it in his pocket; defendant was standing in front of the store door when we left; when defendant struck the deceased, the deceased stepped back off the curb and asked me to go get a doctor, and said, 'He got me.' At the time defendant punched the deceased looked like he just backed off; I could not tell because Mr. Hamit was between me and

the deceased. I do not know what the deceased was doing with his hands, he was just standing there and asked me to get the doctor. I took him to Wright's Grocery Store and put him in a grocery truck and drove to Drs. Johnson & Lindsay's office. I helped undress the deceased and prepare him for the operation; we found a box of snuff and a lead pencil in his pockets."

On cross-examination witness stated he and defendant Hamit came to town, unhitched the team and went to the hardware. "It was about 12 o'clock, I went from the hardware store to McArthur's store; both the defendant and deceased were there when I got there. The Farmers' Grocery or McArthur's store was on the corner of the street; when I met Mr. Livingston he asked if Hellcat Hamit was in town, and I told him he was, and he said 'Let's get together and attend to this business.' I saw the deceased and defendant talking and went over to where they were, when I got there we sat down on some sacks of feed, Livingston was about two feet away from me. Mr. Hamit sat down in the back of a truck or delivery wagon about two feet from us; Mr. Livingston told defendant that the county superintendent said we could do nothing until we found out who the boys were who had been destroying the school property; deceased then mentioned what he knew if he would tell them and the same conversation was practically repeated as given in the direct examination."

Crockett Scrivener testified, in substance, that at the time of the trouble he was running a store next door to the Farmers' Grocery and there was a space of about ten feet between the stores. Dorsey Bryant was working for the witness; their attention was directed to loud talking. "When they heard this noise I walked out toward the front, and knew who they were; there was some cursing and loud talking; I was listening to the talking and saw Mr. Readnour and Livingston standing right straight north of the

Farmers' Grocery Store door; Livingston and Hamit both were standing when I saw them, and I heard him say a time or two, you fellows had better go away and leave me alone, or something to that effect, and used some kind of profanity; I did not hear either of the others say a word; at the time Livingston was not making any gestures, he was just standing there without making any motion that I could see. When I first walked up to the door I saw Mr. Hamit, looked like he had pulled something out of his pocket, and he was talking very loud; I guessed it to be a knife, he opened it up, then shut it, and put it back in his pocket, and the second time he pulled it out again and opened it up; I don't know just what he said now, he just kindly took a step back and stabbed Livingston; I could not tell for sure what part of Livingston's body the lick took effect on; when deceased was struck he just kindly caught himself with his hand and put it down in the bib of his overalls and kindly held himself. Mr. Hamit immediately went into the grocery store and said, "Get the law, I will be here." I did not at any time understand any remarks made by Livingston. The only time I could tell he was saying anything was after he was stabbed he said something to Readnour, and they turned and went across the street. Dorsey Bryant was over at the door; I don't remember if there was any one else; witness was asked if anything was said at the time of this stabbing or like was struck by Dorsey Bryant. Defendant objected to the question, the court overruled defendant's objection, and defendant excepted. Why, he just made a remark, he says, 'Wonder if that damn fool—what is that damn fool standing there and letting that damn fool stab him with a knife for.' We were standing there watching the parties at the time; when I first saw the parties Readnour was next to me, and Hamit was next; they were standing in a circle; Mr. Hamit and Mr. Livingston were standing pretty close together, I would say he took one step for-

ward and stabbed him; they were about twenty feet from me; after Mr. Hamit put his knife in his pocket he turned and went back to the store."

Lee McArthur, a witness for the state, testified that on July 3, 1924, he was working in the Farmers' Grocery; he knew the defendant and the deceased; the first he knew of the difficulty between the parties he heard some loud talking, when he went to the store door Mr. Hamit was talking, he could not tell what the conversation was. "I heard Mr. Hamit talking to Mr. Livingston, and saying, 'You had better go on and leave me alone.' When I went out Mr. Hamit was sitting in the bed of the truck with his feet hanging down and Mr. Livingston was standing facing him, talking to him, and Readnour was standing kindly between where I was and Hamit; when I got out to where I could see, Hamit gets up out of the truck and repeats, 'You had better go on and leave me alone;' when Mr. Hamit got up Mr. Livingston had to get back a little bit to let him take a step out of the truck; when Livingston approached Hamit repeated, 'Go on and leave me alone.' and then he got his knife out; all that I saw was a little motion (indicating); Livingston was standing over in front of Hamit at the time Hamit made the motion. I did not notice Livingston's hands; I would not say what he had in his hands, I don't remember."

On cross-examination witness stated he could not tell how close together they were, they were close together; that when Mr. Hamit raised up he just took one step from the truck in the direction of the door; Livingston moved toward the door, more out of the way between Mr. Hamit and the store door. "When I came out Mr. Hamit was telling Livingston to leave him alone; he repeated it twice I believe that I heard; I did not pay any attention to Tom Livingston's hands, I don't think he had one of them up, I would have noticed if he had."

L. T. Butler, witness for the state, in substance testified he was out at the east end of the Farmers' Grocery, and some one remarked they are having a fuss out there. "I looked down toward where the parties were and saw Mr. Hamit and the man who got killed and a Mr. Readnour; I could hear the old man talking, I could not hear what the others were saying; I mean by the old man, Mr. Hamit, who said, 'You fellows are trying to start something, ain't you? I want you to go away and leave me alone, by God you have bothered me enough.' They talked a little longer with Mr. Hamit, Mr. Hamit was right in front of the door, I think sitting on a bunch of sacks, it might have been a car, when Mr. Hamit got up and turned around their faces were together; Mr. Hamit was facing toward me, not exactly but almost facing me; Mr. Livingston had his back to me, they were saying something I could not understand; I saw the knife in Mr. Hamit's hand, he just give it a punch that way (indicating); he did not draw his arm up, just come straight with it; he did not move at the time he made the punch, he stood still and let his right hand back. Livingston just drawed back in that way and stood there a little bit and talked to him; I never noticed where Livingston's hands were at the time Mr. Hamit made the punch; after the old man punched him with the knife, Livingston just turned around right quick and stepped off the curb and put his hand down in the bib of his overalls, and put his right hand in his hip pocket that way, and stood there a while and talked a little bit and then said something, and the old man turned and went to the corner, and went into the store, which was Mr. Wright's grocery store then."

On cross-examination witness stated he could not understand what was said between the defendant and deceased, that Livingston got down this way (indicating), right out at the center of the walk and they got pretty close together. "Then is when I saw that defendant had a

knife in his hand; Readnour just stood there, and deceased got off the curb and squatted on his left leg and put his hand in the front of his bibbed overalls, and the other hand on his left leg; I could not see anything in his hand; he did not pull a gun."

Art Campbell, a witness for the state, also testified, in substance, the same as L. T. Butler with reference to what took place at the time of the trouble. Dorsey Bryant was called as a witness for the state, and testified to the same facts as did Lee McArthur as to what took place. Finis Johnson, called as a witness for the state, was also an eyewitness to the trouble and testified, in substance, as to the same facts as did the other witnesses regarding the difficulty. The foregoing is all the material testimony offered by the state necessary to be set out.

The defendant, as a witness in his own behalf in substance, testified as follows: After telling where he had previously lived, and the number of the members of his family, and that he was affected with rheumatism and had lost the sight of one eye, stated that he and deceased were members of the school board of the district in which they lived; they lived about two and three-fourth miles apart; Tom Readnour was also a member of the school board; that he went to Pauls Valley on July 3, 1924, with Tom Readnour, who was his brother-in-law; an agreement had been made by the directors to go to Pauls Valley and see the authorities with reference to some damages that had been done to some school district property; he went in Tom Readnour's wagon, that after they put the team up they went to the Farmers' Grocery, and he then went from there down to Mayo's; he did not remember whether Mr. Readnour was with him or not; he then came back to the Farmers' Grocery Store and Mr. Readnour told him that Mr. Livingston was looking for him, he said, "Looky now, Hamit, Livingston is going to bring up something." "I

knew Mr. McArthur and the clerks, Lee and Edgar and Art Campbell; when I said Mr. McArthur, I mean Mr. H. C. McArthur; we came out at the back door and when we got out Mr. Livingston and some man was standing by this feed; Mr. Readnour walked around us and I walked over and set down in the back end of the truck; Mr. Livingston and I had had some trouble before that time; the first time he ever got mad at me, or rather mentioned a word out of the way was about paying for some wood before the wood was put on the ground, I would pay for it; the wood was for the schoolhouse; the next thing he got mad at me about was some one turned him in for making whisky and he accused me of it. Mr. Readnour and Mr. Livingston both accused me of turning them in; no one was present that I remember when he accused me of turning him in; he got mad and said I turned him in and that I was not a gentleman, and I don't know what all; the first time he got after me I was in town; I told him I did not turn him in and he said, 'I know stinking well you did,' he said, 'Readnour said you had;' once after that we came to town and found we had a surplus of money and if it was not used it would go back to the county or state; we claimed and took $100.00 out to use for buying wood or repairing or any purpose we needed about the schoolhouse; we left it with the Valley Hardware; before we got up there Mr. Livingston says, 'Here Hamit, I am needing some money,' and he says we can hold $40.00 of this out and Readnour will never be none the wiser,' and he says, 'Let's do it,' and I refused and he got mad and called me a damned old gray headed son of a bitch, and said I was too darned mean for anything in the world, and I told him to go ahead, and leave me alone that I did not want any trouble, and walked off and left him; later he came and asked me to go down to the wagon yard and have a drink with him, I told him I would go with him but I would not drink; we went into the barn and sat down in the manger in one of the

stalls; he got his knife out and stepped in front of me and started whittling and says, 'Now, God damn you, you will sign up for that money right here, you will sign up for it or something is going to come off.' I told him he could not afford anything like that, and he said I am going to anyhow. By that time I dodged under a plank and picked up a piece of plank and said, 'Now you put up your knife.' He put his knife in his pocket and laughed and said he was joking; I went away and left him in the wagon yard, he was fussy and I knew once he got on his horse at Readnours and took his gun and said he was going to kill John Blackie; I was present when he had a fuss with Frank Young, he was cussing him, and talked very low, and I heard Mr. Young tell him to get on his horse and leave there and that right now, that he was tired of being fooled with; I never saw him but what he had a gun, he carried an automatic all the time; I saw him with it a dozen times or more. One time he came to my house and asked me to sign a contract for a teacher, he set down and went into his pocket and got a pistol and laid it on the desk and I told him to put it back in his pocket as I did not want my wife and children to see it. I heard he said he was going to kill me and I went and talked to Mr. Turner, the justice of the peace and asked what about it, and he said he would investigate it and the next time I saw him he said he did not think there was anything to it.

"He told Jack Snodgrass he was going to kill me; Jack told me Livingston was carrying a pistol for me. Burley Edgmon come by my house one evening after I had had the trouble with Livingston, and told me Livingston wanted to lie down in his wagon and have Edgmon drive up and talk to me, and get to talking about the school district race, and Livingston would raise up and shoot me from the wagon. This was not told to me until after the difficulty. I had taken two drinks of whisky the morning before I had the difficulty with the deceased,

the last drink I took was about two miles from Pauls Valley, it was about two and a half or possibly three hours after the last drink before I met the deceased in town; when I come up to the store where the deceased and Readnour were I went out and set down, and he says I have been up and seen the county attorney and I saw Mr. Hart, and they tell me we will have to find out who the boys were that were destroying the school property before we can do anything, and I said I thought that all the time. Livingston said, 'I know something that would tickle you damn fellows good, or no, I know something that I ain't going to tell you damn fellows.' 'Well,' I said, 'Tom, if it is concerning the school, you ain't no man if you don't tell it;' and he said, 'It don't concern the school a damn bit,' and then I said, 'it don't concern me either;' and he said, 'You God damn son of a bitch you have been wanting me off the school board for some time. Now I am going to get off, now damn you men.' And I says, 'Tom, I ain't said nary time that I wanted you off,' and he says, 'Yes you have, Readnour says so.' I says, 'Readnour tell him that is not so.' He says, 'You are a God damned old gray headed son of a bitch. You want to be contrary with me, you are ding donging at me all the way through, and now I am going to have it out.' And I says, 'I don't want no trouble with you at all;' I think I told him that three or four times, and to go away and let me alone, before the trouble opened; he jumped up first, he was sitting on a sack of feed, and I was sitting in the hind end of the car; he got right in front of me; he had something, maybe a card in his hand, I don't know; and after that as soon as he got straightened up he went to his pocket, or started to his front pocket like that (indicating), and started toward me. Before I could get my knife he throwed his hand back (indicating), advancing toward me, and when he did that I struck him. When he put his hand back as stated, it looked like it was to his hip pocket, he said, 'You old gray headed son of a bitch, it had just

as well come off here as farther up the creek.' I begged
him to go away and leave me alone, I don't want no trouble;
when he come up in front of me and kept cussing me and
calling me a gray haired old son of a bitch and said it had
just as well come off here as farther up the creek, he was
about two feet from me; when I struck him he was not
more than two feet from me, if that far; I never made a
move, just punched him (indicating) ; he advanced toward
me and right in front of me; was between me and the
store door; I could have walked around and went in if he
had not come in ahead of me; I had the knife in my right
hand; I got it out of my pocket; when I struck the deceased
he jumped back, turned around and went off of the side-
walk into the street; he says, 'You have got me.' After
he started off he turned around and looked back at me
with his hand on his hip pocket, looking straight at me.
I walked into McArthur's store. Mr. Vaught took the knife
away from me; he was the jailer at the time. The reason
I stabbed the deceased was I thought he was going to kill
me, that is just what I thought, and from the threats I
had heard I thought that was his intentions; I knew he
carried a pistol and most of the time a knife, and I thought
it was his intention to kill me."

On cross-examination the defendant testified in detail
as to their going to town with Readnour the morning of
the trouble, and the purpose for which they had gone
to town; he told about taking some drinks and also stated
about Readnour being at the Farmers' Store and told
him to look out, Livingston was liable to bring up some-
thing. Defendant stated that when Readnour told him
he took it for granted that Livingston was going to try to
raise a row; he had been at it for quite a while, trying to
raise a row with him but he always kept away from him;
they were not the best of friends but would pass and repass.
It was not the custom when Readnour, Livingston and
myself were together for us to quarrel about something;

Livingston often had some grievance; I did not turn Livingston in to the authorities on a whisky charge. Yes, he was not drunk the day we come with the money and he tried to raise a racket with me that time; I did not drink any the time I went to the wagon yard where he cussed me and I come away from him; I did not cuss him every time I saw him; the time he pulled his knife at the wagon yard I did not cuss him, he did not try to strike me with his knife; when Livingston was talking to us at the Farmers' store I supposed he was cussing both of us, but yesterday Mr. Readnour referred to it as his cussing me, that he was not cussing him at all. I thought Readnour and Livingston were pretty good friends, and I did not hardly know what to think about it; since the trouble I did not think he was cussing Readnour, the way Readnour has been toward me, I thought Readnour was a better friend to Livingston than Readnour and I were; I told them both to go away and leave me alone.

"The reason I supposed both of them were in together, prior to that time he had indicated he did not have the proper feeling toward me; he was distant or seemed to be distant, not like he used to be; I never did see the deceased hit anybody but I have seen him make several passes like he was going to; I took him off one time to keep he and Morgan Perry from fighting; they were cussing each other. I was never with the defendant when I did not see the print of a pistol; I never saw the print of the pistol the day of the trouble but he kept his hand on his pocket; nobody touched him until he started to walk across the street and then Readnour took him by the left arm; I could not say he attempted to pull his hand out of his pocket; he was working his hand up and down, like Mr. Butler told yesterday; he had his hand in his pocket when I struck him; I can't say how Livingston was dressed. I guess I had on a pair of duck overalls and a blue shirt, that is all I am able to wear; I was not

expecting any trouble; defendant was cussing and I don't know whether I was cussing or not; I stabbed him because I thought he was going to kill me. I stated in my direct examination that I never drawed my knife at all until he made a pass at his pocket, and then I told the jury that I drawed my knife. I punched him to keep him from killing me as I thought that it was his intention to do it. I opened and shut my knife one time before I struck him; I did not take my knife out of my pocket and open it, and then shut it and put it back in my pocket; the deceased lived out there near me ever since I moved to that neighborhood. I don't remember telling W. H. Parkey a short time after the trouble happened that I did something there, or on that occasion that I would not have done a minute later, or that I would not have done for anything in the world."

Several other witnesses testified for the defendant as to his previous good character, and detailed statements made by the deceased prior to the fatal trouble, in which the deceased complained of the defendant and made threats against him.

The defendant was recalled by the state after the defense had closed its testimony, and a statement made by the prosecuting attorney that they desired to recall him for further cross-examination. The court held that the testimony had been closed and if they desired to recall the defendant they would have to make him a witness for the state. The prosecution stated they only had two questions they desired to ask the defendant. The record does not show that the prosecution made the defendant its own witness, but it does show the objection of the defendant to testifying, claiming his constitutional right. After he was recalled to the witness stand several pages of the record are taken up in this examination, a great portion of it being questions laying the foundation for the purpose of attempting to impeach the defendant, all of which was objected to by the defendant as the examination progressed.

After the defendant was excused from the witness stand several other witnesses were called, who attempted to contradict the defendant. Most of the examination was on immaterial points. We have referred to all the testimony of the defense we deem necessary to arrive at a proper decision in this case.

Defendant has assigned 14 separate errors alleged to have been committed by the trial court. The first assignment argued is the court erred in overruling his motion in arrest of judgment. In presenting the motion in arrest of judgment it is urged that the court erred in permitting the state, over the objection and exceptions of the defendant, to put the defendant, H. H. Hamit, on the witness stand and examine him as a witness for the state, thus requiring him to give testimony against himself. Section 2756, C. O. S. 1921, is a follows:

"A motion in arrest of judgment is an application on the part of the defendant that no judgment be rendered on plea or verdict of guilty, or on a verdict against the defendant on a plea or former conviction or acquittal. It may be founded on any of the defects in the indictment or information mentioned as grounds of demurrer unless such objection has been waived by a failure to demur, and must be before or at the time the defendant is called for judgment."

The record discloses that defendant demurred to the information, which demurrer was overruled and exceptions saved. Upon an examination of the information it clearly appears that the demurrer was properly overruled. Upon further examination of the record we hold that the ground stated in the motion in arrest of judgment are not such grounds as are recognized by the statute for arresting a criminal judgment. Further, it is noticed that the defendant did not incorporate, as a part of his motion for a new trial, the action of the court in overruling his motion in arrest of judgment. If it was desired by the de-

fendant to save the record and take advantage of the action of the trial court in overruling his motion in arrest of judgment, he should have incorporated it in his motion for a new trial. We hold the court did not err in overruling defendant's motion in arrest of judgment.

It is next urged by the defendant that the court erred in overruling his motion for a new trial. This assignment covers all of the errors alleged by the defendant to have been committed by the court in the trial of his case, including the action of the court in permitting the state to recall him, after he had closed his testimony, for further examination. The defendant contends they had no right to recall him for further cross-examination, and that the state, under the statement of the court, was required to make the defendant its witness, which the defendant contends the state could not do, and compel him to make a witness against himself. When the state recalled him for further cross-examination, the court stated to the prosecution that, if it recalled defendant, it would be required to make the defendant its witness, which the defendant contends the state did not do; he, being the defendant, could not be compelled to give evidence against himself. The defendant in this case took the stand in his own behalf, and when he did so he was in the position of any other witness called in the case, and the state had a right to cross-examine him on matters material to the case. There is nothing in the record to show that the defendant was ordered by the court to answer any question propounded to him that was not proper to be asked on cross-examination. Where the defendant is a witness in his own behalf, great latitude is allowed in the cross-examination.

The defendant urges that he had closed his testimony and the state closed except in rebuttal; that the action of the court in permitting the state to call the defendant back for the purpose of laying a predicate to impeach the

defendant was error. Where the defendant had taken the stand in his own behalf, the courts have been very liberal with the party cross-examining, and we do not find that the court in this instance erred in permitting the defendant to be fully examined. The court may in its discretion permit either the defendant or the state to reopen the case for further testimony and unless a clear abuse of such discretion appears no question is presented for review on appeal. Winfield v. State, 18 Okla. Cr. 258, 191 P. 609; Felice v. State, 18 Okla. Cr. 313, 194 P. 251; Ivey v. State, 21 Okla. Cr. 182, 206 P. 257.

It is next contended that the trial court erred in overruling defendant's motion for a continuance. The motion for continuance was based upon the proposition that the defendant relied upon the belief that his case would not be tried at the January, 1926, term of court, and the further reason that his attorney had discussed this matter with the county attorney, and also the court, and had advised the court that the wife of the defendant was in poor health and was nervous, and would probably be unable to attend the trial, and in addition to that defendant himself was suffering with rheumatism, and that one of his witnesses, Burley Edgmon, was absent.

In the motion for continuance the defendant did not show that he was unable to secure the attendance of Burley Edgmon at a future term of court. The record discloses that the testimony of the absent witness, Burley Edgmon, taken at a former trial, was read to the jury in this case. No showing was made that Edgmon if present would testify to additional facts than he had testified to in the first trial of this case.

It is urged by the defendant that he had been led to believe by the trial court that, if his condition was unchanged on the date the case was called for trial, and the defendant was still suffering with rheumatism, his case

would be continued. Where the defendant is charged with a crime and his case has been assigned for trial, it is his duty to use due diligence to be ready for trial, and to present to the court in his motion for continuance all the facts necessary to be presented in order to secure a continuance. It is impossible for a court to know several days in advance what the condition of the witnesses or the defendant will be on the date the case is assigned for trial.

It is apparent that the defendant was not injured in any respect by a denial of his motion for continuance on account of his physical condition or the absence of the witness Edgmon. It is not contended that the wife of the defendant was a material witness in his behalf, nor is there any showing made that she was needed in the trial. Considering said motion in its entirety, it cannot be said that the court abused its discretion in denying a continuance in this case.

It is next contended that the trial court erred in denying the defendant the right to prove threats and specific acts of violence on the part of the deceased. It is disclosed by the record that the defendant attempted to prove by one of the witnesses a threat made by the deceased against the defendant, which was not communicated to the defendant until after the trouble. Uncommunicated threats are admissible for the purpose of showing the condition of the mind of the deceased at the time of the difficulty, for the purpose of showing who was the aggressor. After an examination of the entire record, we hold that the refusal of the court to permit the defendant to prove this uncommunicated threat is not sufficient error to warrant a reversal of this case.

It is next urged by the defendant that the trial court erred in refusing to give the defendant time in which to plead, and also in refusing the defendant's plea of acquittal of the crime of murder at the former trial of the same

case. Defendant admits that he once entered a plea of not guilty to this information. The plea of not guilty was entered before the first trial of the case. The defendant insists that it was necessary for the defendant to plead again. This trial was continued on the theory that the defendant had pleaded not guilty. It is never necessary for a defendant to plead but once to the same charge, unless such plea has been withdrawn. A second plea was not necessary, as the first plea had not been withdrawn. Thomas v. State, 17 Okla. Cr. 550, 190 P. 711.

Other objections are urged by the defendant, but in the view we take of this record we do not deem them of sufficient merit to be discussed at length, or to justify a reversal. In this case several parties were present and saw the difficulty and heard the conversation of the deceased and defendant before the fatal blow was struck that took the life of the deceased. The defendant relied upon self defense, claiming that he believed at the time he did the stabbing that the deceased was attemping to shoot him with a pistol and that it was necessary for him to strike the fatal blow in order to protect his life or prevent him from receiving great bodily harm. It will be seen from an abstract of the testimony set out in this opinion that the deceased and defendant had been neighbors for some time; that they both were members of the school board in their school district; that arrangements had been made for them to go to town on the date of the difficulty to ascertain what should be done with reference to parties who were damaging the school property in the district; that the defendant and Tom Readnour came to Pauls Valley in Readnour's wagon; after their arrival in town the parties came back to what is known as the Farmers' Grocery Store, and the deceased advised the defendant and Readnour that he had seen certain parties who were county officials, and they had advised him nothing could be done until they learned the names of the boys who had damaged

the school property; that a controversy there arose between the deceased and the defendant, words passed between them, and both arose to their feet and were standing facing each other in close proximity; that the deceased stated in substance that it had as well come off here as farther up the creek, and used cuss words, and that he called the defendant "an old gray headed son of a bitch"; and others testified that he said, "God damn it old man, listen." All the witnesses agreed that the defendant told the deceased to go away and leave him alone. The defendant contends that the deceased put his hand to his hip pocket and that he believed he was going to draw a gun to shoot, as he knew the deceased was in the habit of carrying a pistol. Other witnesses said they could not tell where the deceased's hands were at the time defendant stabbed deceased. The testimony shows without contradiction that, when the defendant stabbed the deceased, deceased turned and stepped off the sidewalk into the street, still having his hand on his hip pocket, and looked back at the defendant, and that the defendant went into the grocery store. Considering the case in its entirety, it is apparent that no reversible errors were committed in the trial of the case.

The judgment of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.