# HARRY DAVES v. STATE.

No. A-10145.    Sept. 22, 1943.

(141 P. 2d 603.)

344

Ownby & Warren and Ward & Ward, all of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, J. The defendant was charged in the district court of Tulsa county with the crime of indecent exposure of his person and private parts in a public place, was tried, convicted and sentenced to serve a term of 10 years in the penitentiary, and has appealed.

The statute under which defendant was charged, 21 O.S.A. 1941 § 1021, is as follows:

"Every person who wilfully and lewdly either:

"First. Exposes his person, or private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby; * * *

"* * * is guilty of a felony and upon conviction therefor shall be punished by the imposition of a fine not less than Ten ($10.00) Dollars nor more than One Thousand ($1,000.00) Dollars or by imprisonment for not less than thirty (30) days nor more than ten (10) years, or by both such fine and imprisonment."

It is first contended that the allegations of the information are insufficient to charge the commission of the crime of indecent exposure. The charging part of the information is as follows:

"* * * did unlawfully, willfully, lewdly, and feloniously expose his person and private parts in a public place, towit: Owen Park in the City of Tulsa, and in a place where there was present another person to be offended and annoyed thereby, towit: Peggy Jean Walkup."

Said information further charges:

"Said defendant was, on the 11th day of October, 1937, convicted of the crime of Indecent Exposure in the District Court of Tulsa County, Oklahoma, and was sentenced to pay a fine of $50.00 and costs, same being case No. 8248, of the records of said Court, * * *."

The contention that the allegations of the information are insufficient is based upon the fact that the alleged offense was committed in "a public place," without alleging any facts or circumstances "constituting the said park as a public place," as contemplated by law.

We think the allegations of the information are sufficient and that it was unnecessary to allege the facts or circumstances which made the park "a public place." Spelling v. State, 55 Okla. Cr. 195, 28 P. 2d 584.

The defendant relies upon the case of Davidson v. State, 20 Okla. Cr. 368, 209 P. 779, 780, to support his contention. We have examined this case, and see a substantial difference in the allegations of the information in that case, and in the one at bar. There it was alleged:

"The defendant 'did then and there (on the 22d day of March, 1918) intentionally, willfully, and unlawfully and lewdly expose his person and private parts in a public place, towit, on the public highway, before a great number of female school children.' "

Here it is alleged that the defendant "did unlawfully, willfully, lewdly and feloniously expose his person and private parts in a public place, to wit: Owen Park in the

City of Tulsa, and in a place where there was present another person to be offended and annoyed thereby, to wit: Peggy Jean Walkup."

The court in the Davidson Case held the information insufficient for the reason that there was not a specific description of the place on the public highway stating that there were probably as many as 100 miles of public highway in Caddo county, holding that defendant should have been informed definitely or approximately where or upon what highway the offense charged was said to have been committed.

This reasoning could not apply to the allegations in the instant case. Here the defendant was charged with the commission of the offense "in a public place, to wit: Owen Park in the City of Tulsa." We do not think it was necessary under the statute to allege in what particular part of the park the offense occurred. That was a matter of proof under the charge, which was alleged in the words of the statute.

In the Spelling Case, supra, it is pointed out that under the statute, a crime is committed if one commits the act in a public place, or if it be committed at any place where there are other persons to be annoyed thereby. Here the offense was alleged to have been committed in a public place, and the evidence supported this charge. It was in the words of the statute, and we think was sufficient.

We next consider the assignment of error that the evidence is insufficient to sustain the verdict.

To sustain the charge in this case, the state relies upon the testimony of three young children, Peggy Jean Walkup, nine years of age, Harold Walkup, her brother, six years, and Betty Joan Milliken, a cousin, nine years of age. There are some discrepancies in the evidence of

these children, as would naturally be expected in children of that age. The main story which they told was that the grandmother of the Walkup children sent them to play in Owen Park in the city of Tulsa on the morning of July 26, 1940. They carried their lunch, and while they were eating it, the defendant, whom they identified, was sitting on a bench a short distance from them. He had a box of ice cream which he was eating, and came to near where they were. He gave them some cigarettes, and some of them smoked. The defendant then went behind some bushes, and exposed his person. Peggy Jean testified:

"Q. Well, what did you see him do—just a minute—now did he take out anything out and wave it at you? A. Uh huh. Q. What was that? A. (Witness laughs) I am not going to tell you. Q. Well, I don't blame you. A. It was something under beneath. Q. Huh? A. It was something under beneath. Q. Did he take it out of his clothes? A. Uh huh. Q. Whereabouts on him did he take it from his clothes? A. He unbuttoned his pants. Q. Unbuttoned his pants, and he took something out? A. Uh huh. Q. And waved it at you? A. Uh huh. Q. What did he say, then? A. Says, 'would you like to see me—would you like for me to give a little squirt,' or something—I forgot what he said. Q. 'A little squirt or something?' A. Uh huh. Q. How far was he from you at that time? A. Well, he was just by a bush, and we was sitting on a bench. * * * Q. * * * And where did you go after you came back out from under the bridge? A. He told us he would give us a nickel if we would let him touch it. I told him, 'no, I am not going to do it.' "

Harold Walkup testified:

"Q. What did you see him do that day? A. When he took us down there in a place, I don't know where it was, but he told me and Frankie to get up in a tree and watch and see if anybody was coming. Q. Who was down there on the ground then? A. Peggy and Dorothy. Q. Was Peggy there that day? A. Uh huh."

And Betty Joan Milliken testified:

"Q. Well, what did you see this man do over there—what did you see him do over there; just tell the men what you saw the defendant do and say? A. Well, he gave us ice cream and— Q. Then what did he do? A. He unbuttoned his pants. Q. Unbuttoned his pants; where, in front? A. Yes. Q. Did he take anything out—do you know what he took out? A. Uh huh. Q. Well, what did he do with it when he took it out? A. He made us feel of it. Q. Made you feel of it? A. Yes. Q. What did he say? A. He just said he was going to give us some ice cream. Q. Going to give you some ice cream. Now, was that another—do you know whether Peggy Jean and Harold had been over there at another time before that? A. Huh uh; I was just there the first time. Q. You were just there this time that you were there? A. Uh huh. Q. You don't know whether that was the time that Peggy Jean was first there, though? A. Huh uh. Q. Well, then did you all do what he said; did you—what did he say then? Did he say he wanted you to feel— A. Yes. Q. And did you do that? A. Yes. Q. And then he got some ice cream for you? A. Yes."

These witnesses reported to their parents and grandparents, and the result was the filing of these charges.

The testimony of the three children was to the same general facts as above related. There are some discrepancies in their testimony, as above stated, but in general the testimony of each is practically the same. The two little girls were in the third grade, and the little boy in the first grade.

Police Officers W. N. Robbins and Harry Stege testified that complaints had been made to the police department of young girls being bothered by some one in Owen Park. That on the 30th day of July, 1940, which was some four or five days after the above happenings, they went to

Owen Park, and while sitting in the park they saw the defendant beckoning to some small children. One of the officers remained with the defendant, and the other went after these children, who testified. The little boy immediately identified the defendant as the party who had been molesting them. Defendant was arrested and taken to the police station. His automobile was parked near the park.

Beulah Johnston, a police matron, testified that the children were brought to the city jail after the arrest of defendant, and she questioned them separately, and each of them identified the defendant as the party whom they had seen at the park.

A. A. Brodie testified that he was deputy court clerk, and there was introduced in evidence a judgment and sentence entered against the defendant, Harry Daves, in case No. 8248 in the district court of Tulsa county, wherein the defendant entered a plea of guilty to the crime of indecent exposure in October, 1937, and was fined in the sum of $50 and costs. Beulah Johnston testified that she was interested in the prosecution of that case, and that the defendant was the same party who received the sentence, and his lawyer admitted that he paid the fine.

The defense of the defendant was that he did not commit this crime, and that he was not the party whom the children had seen in the park. He did not take the witness stand, as was his right.

Defendant introduced as a witness Ed Slater, who testified that both he and the defendant worked for the Shannon Furniture Company. That defendant worked under him during the month of July, 1940, and that they worked from 8 in the morning until 6 in the afternoon,

and took one hour off for lunch, from 12 to 1 o'clock. That they usually had lunch together, just around the corner from where they worked, and it took them from 15 to 30 minutes. That he could not testify positively as to whether they had lunch together on the 26th day of July, but that he had never known defendant to be late in reporting for work after lunch during that month. That the only time he knew him to be late was on the date he was arrested, July 30, 1940. That they generally ate their lunch near where they worked, and that Owen Park was a distance of 15 blocks from the Shannon Furniture Company. He testified that the defendant was repairing stoves and furniture to be ready for delivery, and that he generally wore work clothes. His daughter, Eddie Ruth Slater, 10 years of age, testified that she knew the defendant, that he worked where her daddy worked; that she lived near Owen Park and was at the park in the spring and summer of 1940; that on two or three occasions she saw a man over there who looked like Mr. Daves, the defendant, and that she told her father and mother about it.

The defendant also offered the testimony of Harry L. Dyer, but the court did not permit him to testify at length. He was one of the public defenders, and had been appointed by the court to defend a man by the name of William Bell, about two weeks before the trial of defendant, on a charge of indecent exposure in Owen Park and that he had been sent to the insane asylum. It was dictated into the record that he would testify:

"That William Bell, the person referred to by the witness in his testimony, is of the same height, weight, and apparent age and that he bears a physical resemblance to the defendant herein, Harry Daves, in his face."

The record does not disclose when this party was seen in the park. If it could have been shown to be during the time that defendant was identified as being there, this evidence would have been competent as a circumstance for the consideration of the jury. This error would not be of sufficient importance to justify the reversal of this case.

From the above statement of the evidence, it cannot be said that the same is insufficient to sustain the verdict. If the jury believed the testimony of the three children who positively identified the defendant, and their testimony is not unreasonable, they had the right to come to the conclusion that defendant was guilty as charged. Their evidence is strongly corroborated by that of the police officers, who found the defendant at the park on July 30th, beckoning to these identical children. His being there on this date, having come in his own car, is inconsistent with his defense that he had not theretofore gone to the park during the noon hour, and is strong circumstantial evidence that he was there on prior dates, as related by the children, especially that part of the evidence of the officers that he was seen beckoning to these children.

Counsel for defendant have prepared an elaborate brief, and have raised a number of assignments of error. Some of them are very technical, but are well presented. It is contended that the evidence of the three children was with reference to events which occurred at different times and dates, and therefore constituted separate and distinct crimes. We have carefully examined this evidence, and do not find it to be such as to subject it to this objection. It is true that they testified to two different times, but they would come within the rule that they were a part of a common scheme and plan, and as a part of the same transaction and would be clearly admissible. It was the same children on each occasion, and the same defendant, and it

shows a plan or scheme on the part of the defendant to acts of familiarity of the same kind and character of which he was charged. Johnson v. State, 70 Okla. Cr. 270, 106 P. 2d 149.

We have examined the authorities cited by the defendant, and do not think they are applicable to the facts here presented.

It is also complained that the defendant was not properly identified at the police station by the children, and that the officers testified that the children identified defendant. This evidence may not have been competent, but was not such that it prejudiced the defendant, in view of the whole record in this case.

There is also complaint that the proof of former conviction of the defendant was insufficient to permit this issue to be presented to the jury. We have already stated the manner in which this was presented. It was by the introduction of the judgment and sentence, and the testimony of a witness that the defendant was the identical person named in the judgment and sentence. Pitzer v. State, 69 Okla. Cr. 363, 103 P. 2d 109; Spann v. State, 69 Okla. Cr. 369, 103 P. 2d 389; Leasure v. State, 46 Okla. Cr. 70, 283 P. 1023; Bassett v. State, 42 Okla. Cr. 126, 274 P. 893; and O'Neil v. State, 76 Okla. Cr. 107, 134 P. 2d 1033. The fact that the judgment and sentence was signed by the judge at a later date was not such error that would defeat this proof.

The contention that defendant was not identified by the children who testified because they referred to him as "he", "him", "the man here," "there he is," "that man, whoever he was," and "that man right there," does not need consideration. These small children only used the terms that any small child would use in identifying a

strange person. They would not be expected to use the name "Harry Daves," as suggested by counsel.

The contention that the venue was not proven in this case is untenable. The testimony of Peggy Jean Walkup was that she lived at 10 North Sante Fe street, and it was only a short distance to Owen Park. The officers also testified as to the identity of Owen Park, and defendant's own witness, Ed Slater, testified that Owen Park was only 15 blocks from Shannon Furniture Company in Tulsa, where defendant worked. This evidence was sufficient to establish the venue.

The contention that the three witnesses were so young and immature that their evidence was such that it should not be received cannot be sustained. It is true they were young and especially the little boy, but the trial judge was in a better position to see and know whether these children were of such mentality that they could testify and knew the seriousness of their testimony. They seem to be above the average and we do not think the court erred in permitting them to testify, and that he did not abuse his discretion by so doing.

In the early case of Walker v. State, 12 Okla. Cr. 179, 153 P. 209, 212, this court had this question under consideration in a case where the facts were very similar to the facts here presented. The witness was nine years of age, and Judge Doyle in speaking for the court said:

"The first question presented is, Did the court err in holding the child, Bessie Burgess, competent as a witness?

"Our statute provides:

" 'The following persons shall be incompetent to testify:

" 'First. Persons who are of unsound mind at the time of their production for examination.

" 'Second. Children under ten years of age who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly.'

"Section 5050, Rev. Laws [12 O. S. 1941 § 385].

"Under the statute, when a witness is objected to, on the ground of incompetency by reason of nonage, or want of intelligence, it is the province of the trial court to determine the witness' competency, and its decision will not be reviewed unless there is a clear abuse of discretion, or the court admits or rejects the witness upon an erroneous view of a legal principle. Adams v. State, 5 Okla. Cr. 347, 114 P. 347.

"The examination of the witness Bessie Burgess shows that she was 9 years old; that she knew when she held up her hand she was swearing to tell the truth; that she had attended Sunday school and had learned about God, and if she was a good girl and always tell the truth she would go to God; that if she would tell a story she would go to the Boogerman.

"Counsel for the defendant then asked her if she knew 'the meaning of an oath.' She answered, 'No, sir.' It is contended that this answer of the witness shows incapacity and incompetency and therefore 'The court committed an abuse of discretion in permitting her to be sworn and to testify as a witness.'

"There is no precise age fixed at which children are excluded from giving evidence. Under the statute the competency of children is to be determined, not by their age, but by the degree of understanding which they appear to possess. As a general rule, the child should appear capable of distinguishing between good and evil, and should be of sufficient intelligence to have a just appreciation of the difference between right and wrong and a proper consciousness of the punishment of false swearing.

"In this case no question seems to have been made as to the witness' capacity to receive just impressions respecting the facts upon which she was to be examined. While she stated that she did not understand the nature of an oath, as possibly many an adult might do if required to define the nature of the crime of perjury, we are satisfied that she understood the difference between right and wrong and the danger of false swearing, and that she was of sufficient intelligence to appreciate the conditions in which she was placed. Courts of justice should regard substance, not words, and a child that has an adequate sense of the impropriety of falsehood does understand the nature of an oath in the proper sense of the term, even though she may not know the meaning of the word 'oath,' and may never have heard that word used. Williams v. United States, 3 App. D. C. 335.

"In this case it does not appear by the preliminary examination of the witness that she was incapable of receiving just impressions of the facts about which she was to testify or of relating them truly. For the reasons given, we are of the opinion that this witness was properly permitted to testify."

See, also, Cargill v. State, 25 Okla. Cr. 314, 220 P. 64, 35 A. L. R. 133; Darneal v. State, 14 Okla. Cr. 540, 174 P. 290, 1 A.L.R. 638; Moore v. State, 51 Okla. Cr. 13, 299 P. 239; Barker v State, 33 Okla. Cr. 25, 242 P. 274.

It is next contended that the argument of the assistant county attorney was such that it was prejudicial to the rights of the defendant and that it was of such an inflammatory nature that the defendant was prejudiced before the jury.

In the first place, no exception was taken to the argument at the time it was delivered. It was only after counsel had finished his argument that counsel for defendant moved the court for a mistrial. This has been

held not to be the proper mode of exception. Buck v. Territory, 1 Okla. Cr. 517, 98 P. 1017; Chambers v. State, 28 Okla. Cr. 156, 229 P. 646; Rice v. State, 66 Okla. Cr. 434, 92 P. 2d 857; Peters v. State, 71 Okla. Cr. 175, 110 P. 2d 300.

Aside from this, we have read the argument as presented in the case-made. It is true that counsel's argument to the jury was in vigorous language and evidently from the verdict rendered, it had an effect upon the jury. But in cases of this character it may be expected that forceful arguments will be made. We have not found any statement in the record that would justify a reversal of this case for this reason. We shall refer to this contention when considering the last assignment of error.

The most difficult question presented is whether this case should be reversed and remanded for a new trial, or the judgment and sentence modified. The punishment assessed was the maximum of ten years in the penitentiary. It is strenuously insisted that this punishment is excessive, and is the result of passion and prejudice, as a result of the argument of the assistant county attorney, newspaper articles, and other conditions that existed in Tulsa county at the time of this trial.

We have heretofore discussed certain alleged errors, and have come to the conclusion that they were insufficient to alone cause a reversal of this case. We now under the above contention look at this record as a whole.

The statutes of 1910 re-enacted part of this identical statute, which had been adopted from the Dakota Code. Both of these statutes made the penalty for a violation thereof a "misdemeanor," which under our statute provided for punishment of not to exceed $500, or imprisonment not to exceed one year. The Legislature of 1935

amended this statute. The only change made therein was that the penalty was changed from a misdemeanor to a felony, and the punishment was provided of a "fine not less than Ten ($10.00) Dollars nor more than One Thousand ($1,000.00) Dollars or by imprisonment for not less than thirty (30) days nor more than ten (10) years, or by both such fine and imprisonment."

The reason for this change does not appear, and it need not be questioned. The Legislature had the right and power to so amend the statute.

An examination of the authorities, so far as we have been able to examine them, reveals that in similar statutes of the different states, crimes of this character are designated as misdemeanors, and punishment consists of a fine or jail sentence, or both, at the discretion of the jury or court. We have not found any statute which makes a crime of this nature a felony.

We have examined the Oklahoma cases which have construed this statute. All of these were prior to the amendment in 1935. They are: Davidson v. State, supra; Spelling v. State, supra; and McKinley v. State, 33 Okla. Cr. 434, 244 P. 208.

In the Davidson Case the penalty was assessed at $500 fine and 60 days in jail. This case was reversed. It was somewhat similar to the instant case, as the party was charged with exposing his person in a public park to small school girls. In the McKinley Case, the punishment was a fine of $25 and costs; and in the Spelling Case the punishment was assessed at six months in jail.

We realize that the punishment given in these cases is not controlling in the case at bar, but they do show views of the courts and juries in cases of this character, and while not condoning the acts and conduct of this de-

fendant, we cannot but come to the conclusion that the jury in rendering the verdict they did in this case acted under passion and prejudice.

As we have so often said, after the verdict of the jury, the only relief that can be granted by the trial court is to set the verdict aside and grant the defendant a new trial. This, of course, is often a burden and extra cost upon the county which causes the trial court to hesitate. Under the law this court has the right to modify the judgment and sentence, without the necessity of the expense of a new trial and the burdens thereof. Johnson v. State, supra; Bright v. State, 76 Okla. Cr. 67, 134 P. 2d 150 and Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246.

It is not the purpose of this court to refuse to reverse and remand cases where error has been committed, and the defendant by reason thereof has suffered substantial prejudice. Nor is it our purpose to modify the judgment and sentence when these errors exist. It is only when the record clearly reveals the guilt of the defendant, and the errors are such that they did not deprive the defendant of a fair and impartial trial, or of a statutory or constitutional right, that this power will be exercised. But the facts in the instant case justify the necessity and rightfulness of this power.

The Legislature in 1935 evidently had a good reason for raising the penalty in this class of cases from a misdemeanor to a felony. The facts in the instant case, if true, and we may assume from the verdict of the jury that they are true, are revolting to the public. The defendant should be punished, but it should be within the bounds of justice and reason, and should not be the result of passion and prejudice.

We think that justice will be best subserved by modifying the judgment and sentence in this case from ten years in the penitentiary to a term of one year in the penitentiary; and as so modified, the judgment and sentence of the district court of Tulsa county is affirmed.

JONES, P. J., concurs. DOYLE, J., dissents.