Paul HEARTSILL and Claud C. Arnold, Plaintiffs in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12627.

Court of Criminal Appeals of Oklahoma.

May 6, 1959.

On Rehearing July 8, 1959.

ters, County Attorney, Carter County, Ardmore, for defendant in error.

BRETT, Judge.

This is an appeal by Paul Heartsill and Claud C. Arnold, plaintiffs in error, defendants below. They were charged by information in the District Court of Carter County, Oklahoma, with the crime of conspiracy to defraud the State of Oklahoma. 21 O.S.1951 § 424. They were tried to a jury, convicted, and the punishment for each fixed at one year in the state penitentiary and a fine of $5,000. Judgment and sentence were entered accordingly, from which this appeal has been perfected.

21 O.S.1951 § 424 reads as follows:

"If two or more persons conspire either to commit any offense against the State of Oklahoma, or to defraud the State of Oklahoma in any manner or for any purpose, and if one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars ($10,000.00) or to imprisonment for not more than two years or to both fine and imprisonment in the discretion of the court or jury."

■ The defendants urge several propositions. First, they contend the trial court erred in not sustaining their motion to suppress certain evidentiary documents taken from the office of Mr. Champion, counsel for Claud C. Arnold. The record discloses in this regard that the records in question were the property of Mr. Arnold, in custody of his lawyer, Mr. Champion. No part of the records belonged to Mr. Heartsill and they were not on his property. So far as Mr. Heartsill is concerned, he is in no position whatsoever to question the taking or to object to the introduction of the evidence thereby obtained. Rogers v. State, 72 Okl.Cr. 123, 113 P.2d 606; Sparks v. State, 72 Okl.Cr. 330, 116 P.2d 219.

The only question involved in this point is as to the taking in relation to Mr. Arnold, to whom the records in Mr. Champion's cus-

J. B. Champion, Jr., Wilson Wallace, Ardmore, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Harley Ven-

tody belonged. The trial court found that there was a consent for the county attorney's action and overruled the motion to suppress. It is therefore apparent that even when viewed from the standpoint of the defendant, the question presented is did the trial court abuse his discretion in overruling the motion? Lawson v. State, Okl.Cr., 296 P.2d 515.

In Byford v. State, 90 Okl.Cr. 230, 212 P.2d 476, 477, we held:

"Whether a search and seizure * * * is or is not unreasonable within the constitutional provision forbidding unreasonable searches and seizures, is a judicial question to be determined in view of all the facts and circumstances under which the search and seizure was made."

Gilbert v. United States, 10 Cir., 163 F.2d 325. The evidence presented in support of the proposition covers eighty pages of transcripted testimony. Summarized, it is substantially as follows. It appears in Mr. Champion's opening statement he was endeavoring to locate Mr. Arnold's books and records which had been used by the preceding county attorney before a grand jury, which did not agree on an indictment but suggested another grand jury. The succeeding county attorney, Mr. Venters, determined the evidence was sufficient to warrant a prosecution and charged the defendants by information with the crime of conspiracy to defraud the state. It appears a tremendous quantity of Mr. Arnold's records was obtained from Mr. Hulme, Mr. Arnold's C. P. A., by Mr. Champion. Mr. Champion contacted the county attorney relative to some of Mr. Arnold's records he knew were in the possession of the county attorney. The case-made shows that there was some kind of agreement between the county attorney and Mr. Champion. In his opening statement at the hearing on the motion to suppress, Mr. Champion said: "The talk of exchanging records was talked about in fairness to him (Mr. Venters. He states at that time, and I think it is borne out in the preliminary transcript, that at that time there was an agreement to exchange." In his testimony on the matter concerning the agreement, Mr. Champion said: "The gist of the conversation was that Harley (Venters) contended there was an agreement by which he could take them, and that he would exchange records and I contended he could not take them in that manner." On cross-examination, Mr. Champion admitted he had the conversation about exchanging records and conceded he did not know how the county attorney "could be kept from getting the books by legal process * * *." He further testified he would not state the word "exchange" was not used. Mr. Champion said he would not say he did or did not agree to an exchange of records. He said, in speaking to Mr. Venters: "To the best of my recollection you were told insofar as the records were concerned to go ahead and inspect them yourself and no one else was told to." Notwithstanding the foregoing, he testified he then told Mr. Venters he could not get them, "that he knew the proper way to get them and it was not by coming into my office over my protest." These contradictory statements must be read in light of the rest of the record.

The testimony of Mr. Venters, Mr. Wilson Wallace, counsel for Mr. Heartsill, and Mrs. Fisher, Mr. Champion's secretary, throws light on what took place. Mr. Venters' testimony as to how the conversation arose concerning the agreement is substantially the same as that of Mr. Champion. He said that Mr. Champion called him about exchanging records. Mr. Venters testified positively they had an agreement to exchange records and in substance said there would be no necessity to subpoena them. Later, it appears, after Mr. Venters and Mr. Gene Ritter, counsel for another party not herein involved, had taken an incomplete deposition from Mr. Hulme in his office, it was suggested that they retire to Mr. Champion's office and by aid of the records therein complete Mr. Hulme's deposition. Mr. Ritter did not agree. Nevertheless, Mr. Venters and his

assistant, Mr. Braver, and two state auditors went to Mr. Champion's office to look at the records. Upon arrival they found Mrs. Fisher engaged in a telephone conversation with Mr. Champion who was at home, ill, and she turned to Mr. Venters and said Mr. Champion was on the telephone and wanted to speak to him. It is apparent that Mr. Ritter called Mr. Champion and advised him that Mr. Venters and his associates would probably make an appearance in his office. Mr. Venters testified that he stated to Mr. Champion his object in being there and Mr. Champion indicated, in keeping with their prior agreement, it was all right. He testified he asked Mrs. Fisher to come and make a list of the documents pulled for photostating, which she did on a yellow note tablet. He said he also called the photostat office to come and get the records. The representative of that office came in and left but agreed to return because no sufficient number of records had been pulled from what Mr. Champion described as a truck load of documents.

Mr. Wallace, whose office is in the same building as Mr. Champion's, came in shortly thereafter and was quite indignant concerning the operation. Mr. Venters testified he told Mr. Wallace he had an agreement to exchange records with Mr. Champion. Mr. Wallace testified he called Mr. Champion who told him, in substance, they could look at the records but he had given no permission to take any records. Mr. Wallace said he "was put out with Mr. Champion about making an agreement with Mr. Venters." After Mr. Wallace left, Mr. Venters testified, Mr. Champion called again. He said Mr. Champion informed him "he did not know what Mr. Wallace and Mr. Ritter were driving at but they had been calling him. He didn't know how they could keep the state from getting the records." In addition, he testified Mr. Champion said Mr. Arnold had nothing to hide and he had never attempted to keep anybody from looking at his books and records. But, Mr. Champion said "that in order to protect him and kind of keep them

off of his back, he would like for Mr. Venters to get out a duces tecum subpoena on him." Mr. Venters testified he got in touch with his office and arranged for such a subpoena to be served. A number of documents had been withdrawn, and Mr. Venters gave them to Mr. Braver who left with them for the photostating shop. .He said Mr. Braver had been gone for some five minutes and Mr. Champion called the auditor, Mr. Burch, and Mr. Venters, and said he did not want them to take anything from the office. After that, he took no .more records.

Mrs. Fisher, Mr. Champion's secretary, testified that after Mr. Burch got off the telephone, Mr. Venters got on the telephone and Mr. Champion told him not to take any records. She also testified although she was listening on an extension telephone, she never heard Mr. Champion tell him prior to that telephone call not to take any records. She said she never saw Mr. Venters take any records out of the office.

This evidence formed the basis for Judge Morris' holding that the operations were the result of consent and not the result of an unlawful search and seizure. It is almost an inescapable conclusion that Mr. Champion did agree to an exchange of records, for photostating, but after some records had been taken met so much opposition from Mr. Wallace and Mr. Ritter that he withdrew the consent, and the operations of the county attorney were concluded. Judge Morris' findings, although based on conflicting evidence, are sustained by sufficient evidence, and we can find no abuse of discretion in this regard. Glance v. State, 89 Okl.Cr. 1, 204 P.2d 296, to the effect the Court of Criminal Appeals will not reverse the trial court upon a finding of fact in connection with a motion to suppress the evidence where there is competent evidence in the record reasonably tending to support the findings of the trial court. Griffin v. State, 90 Okl.Cr. 90, 210 P.2d 671; Peterson v. State, Okl.Cr., 280 P.2d 1029; Simmons v. State, Okl.Cr., 286 P.2d 291, and many other cases from Okla-

homa and other jurisdictions; 24 C.J.S. Criminal Law § 1884, n. 47, p. 830 pocket part.

It is urged that the records taken were not returned until just before trial. It does not appear that any demand was made for their production, or objection registered because of failure to return them sooner. If they were needed at an earlier time, it is not unreasonable that counsel would have complained about their unavailability. We can only conclude they were not necessarily desired by counsel, and this complaint is without merit. Furthermore, we cannot say the county attorney's method of handling this situation was improper, in view of the trial court's finding of consent for what was done and the record in support thereof.

■■ The defendants next complain of the trial court's failure to grant a continuance. The record shows this action was instituted by filing a preliminary complaint in the County Court of Carter County, Oklahoma, on March 14, 1957. On March 18, 1957, a demand was filed in the County Court for the state to produce certain documents in its possession by defendant Heartsill. The motion was overruled on March 21, 1957. A like motion was filed by defendant Arnold on March 22, 1957. The latter petition was heard and denied on March 22, 1957. The defendants were bound over to the District Court and an information charging them with conspiracy to defraud the state was filed in the District Court on April 18, 1957. Thereafter, on August 27, 1957, defendant Heartsill filed a demand therein for copies of certain documents in the county attorney's possession. A similar motion was filed by defendant Arnold on September 6, 1957. Judge Caldwell, District Judge of Carter County, disqualified and the Supreme Court was asked to appoint another judge. It appears the case was set for trial on September 9, 1957, but was stricken and reset for September 11, 1957, because no judge had been assigned by the Supreme Court to hear the case. It further appears that the matter was continued from

September 11 to September 17, 1957, because counsel for one of the defendants could not appear on September 11. Thereafter, the defendants filed a motion to suppress certain documentary evidence, which was overruled by the court as hereinbefore set forth.

It was at this point that defendants interposed an oral motion for continuance. In said motion it was urged that Mr. Venters, the county attorney, had not made available to the defendants any of the papers on which these charges were based until they were handed to them the morning of September 17, and for that reason they could not possibly be ready for trial. That is the principal ground urged for reversal on this appeal.

The lack of merit in this contention becomes apparent in view of the admissions of counsel for both defendants made in presenting the said motion. Mr. Champion said he had been ready twice but on neither occasion was the county attorney present in court ready for trial. Mr. Wallace said: "This particular case was originally set for trial September 9, 1957. These two defendants were in open court with their counsel and their witnesses ready for trial * * *. The defendant Paul Heartsill whom I represent was ready for trial on September 9, 1957." The documents in question which they now assert were so material to their defense were not delivered to them until the morning of the day of the trial. The inconsistency of this contention is quite apparent. If they were ready on September 9, 1957, without the records, they should have been doubly ready with them on September 17. Moreover, the defendants never at any time after their demand for the documents was filed in the District Court attempted to have them called up for hearing. They knew where the records were but never occupied themselves with going to the county attorney's office to expedite the demand for copies of the records included in their demand. It appears the county attorney had the records available for the defendants on Friday, September 13. If it had been

so urgent that they acquire the records in question, they could have been available with the exercise of proper diligence.

Neither the state nor the defendants cite any cases controlling this contention as to missing records desired for defense purposes. The rule is stated in 22 C.J.S. Criminal Law § 493, p. 771:

"An application for continuance to procure record evidence or depositions rests substantially on the same merits as when made because of the absence of witnesses; the granting is, therefore, often largely in the discretion of the court."

22 C.J.S. Criminal Law § 502, n. 11, p. 800, says a person must be industrious not only in securing needed witnesses, but also in producing such written evidence as his case requires. Harter v. People, 204 Ill. 158, 68 N.E. 447. In Musgraves v. State, 3 Okl.Cr. 421, 106 P. 544, 545, it was said:

"The law requires diligence in these matters. A defendant cannot sit still and wait until just before his trial before he begins to get ready for trial. He must be diligent; and, if special reasons exist upon which a reasonably prudent man would rely, which would cause him to fail to exercise the utmost diligence, he must state these reasons in his motion for continuance as an excuse for not having exercised the utmost diligence. No such reasons are stated in the motion in this case. Continuances are not granted as matters of favor or convenience. Defendants must learn that it is a very serious matter to violate the laws of Oklahoma, and that when they are charged with such conduct, they must be diligent in preparing their defense. There was no error in the action of the trial court in overruling the motion for a continuance."

Hopkins v. State, 9 Okl.Cr. 104, 130 P. 1101, Ann.Cas.1915B, 736; Hamit v. State, 42 Okl.Cr. 168, 275 P. 361; Wiles v. State, 52 Okl.Cr. 162, 3 P.2d 245; Gorum

v. State, 67 Okl.Cr. 75, 92 P.2d 1086. In Edwards v. State, 9 Okl.Cr. 306, 131 P. 956, 960, 44 L.R.A.,N.S., 701, we said:

"* * * when a defendant seeks a continuance he must give the court something more than his opinions and hopes; otherwise it would be well-nigh impossible for the trial courts of this state to dispose of the cases before them. * * * The granting or refusal of a continuance in a criminal case is largely a matter of discretion with the trial court, and this court will not review the action of a trial court in refusing to grant a continuance unless it is shown that there has been an abuse of this discretion."

Where a motion for continuance fails to show that all the legal remedies to obtain evidence have been exhausted before the request therefor, it is insufficient on its face. Ryal v. State, 16 Okl.Cr. 266, 182 P. 253. Under the conditions presented herein, we cannot hold Judge Morris abused his discretion in denying the continuance.

■■ The defendant's third contention is the "trial judge should have declared a mistrial or granted a new trial because of the prejudicial statements of the county attorney to the jury in his closing arguments." None of the arguments of counsel were recorded, and hence, do not appear in the record. Moreover, no objection to the remarks was interposed at the time they were made, and no motion to exclude the remarks from the jury's consideration appears. The only record of the purported prejudicial statements is contained in the motion for mistrial of defendants. Therein it is asserted, "that the County Attorney made a misstatement of the evidence concerning the books and for the reason that he stated before the jury in open court words in effect that 'they told me they would buy the witnesses,' all of which statement did not conform to the evidence * * and further the statement was that 'they told me I could not win the case, that they would buy the jurors.'"

To the foregoing it appears the county attorney "denies that he made such a statement as that stated by counsel, but to the contrary that he said as follows: That after an examination of all the records pertaining to the account owed by Carter County District 1, and with reference to the claims filed during that period ——." At this point, the trial court interrupted: "The motion will be overruled and exceptions will be allowed."

The record is certainly not clear as to whether this proceeding was in the presence of the jury before it retired. It is clear that no objection was interposed at the time the alleged statements were made, if they were in fact made. The trial judge was apparently not impressed with the fact they were made as contended by defense counsel, and his determination of the matter leads us to conclude two things: that having heard the arguments, he was impressed with the county attorney's denial; and, that if this had happened in open court with the jury present, he would have admonished the jury, upon proper objection, whether counsel requested it or not. The very uncertainty of the conflicting and speculative record on this matter affords ample reason for the following rules applicable herein.

In Barber v. State, 94 Okl.Cr. 306, 235 P.2d 726, 727, syllabi two and three read:

"Ordinarily, error cannot be predicated on mere unexplained excerpts from remarks of counsel to jury, and enough must appear of record to advise appellate court of what preceded alleged objectionable remarks and their meaning to be deduced from context, and whether they were invited or provoked by remarks of opposing counsel.

"Counsel for defendant must not only object to alleged improper statements of county attorney in argument to jury, but counsel must go further and move court to exclude such remarks from jury and instruct jury not to consider them for any purpose, unless remarks were of such character that error would not be cured by withdrawal of remarks."

Daves v. State, 77 Okl.Cr. 343, 141 P.2d 603, 611, after citing the last quoted rule, states:

"In the first place, no exception was taken to the argument at the time it was delivered. It was only after counsel had finished his argument that counsel for defendant moved the court for a mistrial. This has been held not to be the proper mode of exception. Buck v. Territory, 1 Okl.Cr. 517, 98 P. 1017; Chambers v. State, 28 Okl.Cr. 156, 229 P. 646; Rice v. State, 66 Okl. Cr. 434, 92 P.2d 857; Peters v. State, 71 Okl.Cr. 175, 110 P.2d 300."

Gorum v. State, supra. In Conway v. State, Okl.Cr., 320 P.2d 419, 420, in syllabus two, we said:

"Objection of defendant to remarks of county attorney should be interposed at time of argument and a motion to exclude them from consideration of the jury should be made."

Applying these rules to the argument complained of, the manner in which counsel sought to raise and preserve this objection is not sufficient to properly present the same to us. The trial court, who heard the arguments, was in a better position to know what transpired and his ruling on the matter based upon his first hand information is a much better predicate for decision than one would be predicated upon speculation and surmise. If objection to the argument had been made at the time the alleged statements were made, we feel certain had they been objectionable, Judge Morris would have admonished the jury not to consider them. If counsel had been impressed at the time of the argument as they now seem to be, they would have followed the procedure provided for such situation. It is well to note that this point was not preserved in the motion for new trial, which is a fundamental requirement.

The fourth proposition of the defendants is that "the court erred in not

sustaining the demurrers and motions for directed verdict because of the county attorney's agreement not to prosecute and that it was a violation of the constitutional rights of the defendants to prosecute 'only them'." This contention is bad for three reasons. First, it is not supported by proper predicate in that no such demurrers appear in the record, and the motions for directed verdict raise no such proposition. Under these conditions, we have no authority to consider the proposition. Second, we know of no constitutional right accruing to a defendant because the county attorney may elect to prosecute some people and not others. The defense attorneys cite no authority in point on this contention. The third reason is based upon the proposition of an alleged agreement with the county attorney that if the money of which Carter County had allegedly been defrauded was repaid, that would settle the case and immunity from prosecution would be extended to Mr. Arnold. It is asserted that was the only reason the money was repaid. This was emphatically denied by the county attorney.

Even if such agreement had been entered into, it would not be binding as being contrary to public policy. It would place a premium on fraud and create an avenue of escape when the fraud was discovered. The law does not trifle with itself in such matters. Even if the evidence supported the basis of this contention, the county attorney could not compromise the state's right to criminal prosecution by accepting restitution of money of which the state had been defrauded. As was said in Savitt v. United States, 3 Cir., 59 F.2d 541, 544: "Restitution does not nullify or excuse a previous crime." In State v. Kiewel, 173 Minn. 473, 217 N.W. 598, 600, it was held: "Crimes cannot be settled or compromised; and any agreement to settle or compromise them is void and constitutes no defense to a prosecution therefor." 22 C.J.S. Criminal Law § 41, n. 59, p. 97; 16 C.J. 92, Criminal Law § 61, n. 87. We have recognized and approved these principles in Huckaby v.

State, 94 Okl.Cr. 29, 229 P.2d 235, 238, wherein we said:

"The reason for the rule is stated in 22 C.J.S. Criminal Law § 41, page 98 and see 16 C.J. 92 and being that 'the status of an act as a crime is fixed when it is once completed, and the status cannot be changed by the subsequent act of the criminal or of third persons,' or the reason is, as put by Prof. Wharton, 1 Wharton Criminal Law (11 Ed.) § 1 82: 'that parties cannot by consent cancel a public law necessary to the safety and morality of the State.' "

This contention is wholly without merit.

 It is contended that the jury did not take into consideration the restitution of the money obtained in these frauds, nor the good reputation of the defendant, Arnold. With this we cannot agree for we are of the opinion that had it not been for his involvement in this case, a much more severe penalty would have been imposed. We know of no requirement of law that compels a jury so to do. The jury did not assess the maximum penalty. They must have been moved by Mr. Arnold's good standing alone, for certainly the facts, as hereinafter stated, would have supported the maximum penalty.

 The fifth contention advanced by the defendants is that the court erred in not granting a new trial because of inflammatory and prejudicial remarks made in the presence of the jury by Mrs. Heartsill, wife of one of the defendants. The remarks complained of appear only in evidence offered on the motion for new trial. No reference is made to them either in the motion for new trial or a supplement thereto. It is urged that Mrs. Heartsill, who sat by her husband's side during much of the trial, became upset by testimony of defendant Heartsill that she spent the night of December 11, 1954, in Paris, Texas, with him. Testimony on this point makes it appear she became angry when she suspected

it was with some other woman.[1] The alleged remarks complained of, according to the testimony, were made in the presence of the jury as they were filing out at recess time. The witnesses were in hopeless disagreement as to when this incident occurred, as well as what was said. Mrs. Woodley testified it occurred on the first day of the trial sometime in the afternoon. But, this could not be for no reference was made to an alleged trip to Paris, Texas, until the third day of the trial. Mrs. Woodley testified Mrs. Heartsill said: "I don't give a damn what they do to any one of the s. o. b. s. They ought to hang every damn one of them."

Mr. McLuskey said the incident occurred during the latter part of the trial. He related he was standing by Mrs. Heartsill when the jury was filing out. Mrs. Heartsill, he stated, said she "didn't stay all night with the lying s. o. b. at Paris. If I was on the stand, I could put him in the penitentiary for twenty years."

Mr. Cullum testified the incident occurred on the second day of the trial at a recess for supper. The reason he gave for remembering it was they came back after supper for a while. He could not be correct as to the day, as no supper recess was taken until the third day of the trial. It is rather significant that this witness at no place in his testimony related what was purportedly said, he only testified he heard her make remarks. What the remarks were, he in no way was called upon to relate. It is quite pertinent that none of the witnesses swore the jury heard the remarks, only that they could have if they had been listening. No other witnesses were called on this point.

It was in no way proven that any juror heard what was purportedly said, but was presented on the basis of sheer speculation. Unless we go into the thin air of metaphysics for inspiration, and indulge in rank speculation, we cannot find that the jury heard the remarks, much less was influenced by them. The burden of proof is on the defendants to show that the jurors heard the remarks and were influenced by them to the defendants' prejudice. The defendants have not met the burden in this regard placed upon them by the law.

In State v. Blancett, 24 N.M. 433, 174 P. 207, 210, the rule is announced:

" 'Remarks of bystanders unfavorable to the accused, to or in the presence of members of the jury, and overheard by them, although reprehensible, are not ground for a new trial, unless it shall actually appear that a verdict of conviction was produced thereby.' 12 Cyc. 730; State v. Wimby, 119 La. 139, 43 So. 984, 12 L.R.A.,N.S., 98, 121 Am. St.Rep. 507, 12 Ann.Cas. 643; State v. Thomas, 135 Iowa 717, 109 N.W. 900."

People v. Pyle, 44 Cal.App. 130, 185 P. 1019; 23 C.J.S. Criminal Law § 1449, p. 1183. Under this showing we cannot say the trial judge erred in overruling the motion for new trial on this ground.

1. This situation arose out of the testimony of Sam Gainsburg of Paris, Texas, called by the defendant, who operated the Lamar Equipment and Supply Company, Mosier Construction Company, and Lamar Trucking Company, a gravel operation. Gainsburg was called by the defendant to establish that on December 12, 1954, Heartsill and his wife were in Paris, Texas, and not in Ardmore. The jury apparently did not give this testimony much weight. Gainsburg testified during 1954 and 1955 he did considerable business with Carter County, Oklahoma. He said they did a lot of business with a lot of counties. (It is not clear if he meant a lot of Oklahoma counties.) He said they sold all kinds of building materials, road supplies, grader blades, tin horns, lumber, and gravel. Mr. Heartsill said he just barely knew Mr. Gainsburg. Mr. Gainsburg said he had known Mr. Heartsill for six or seven years. The record discloses they were supposed to have traded some cattle and a shetland pony on December 12, 1954. On cross-examination, Gainsburg was not sure of the date. Heartsill admitted he bought lumber and other material from Gainsburg. We can hardly see the necessity for going to Texas to buy such supplies as this company sold. Of course, if these things were not available in Oklahoma, there would be some excuse.

It is contended in proposition six that there was no corroboration of the parties designated by the trial court as accomplices, that the evidence does not connect defendant Arnold with the commission of the crime, and further that the trial court erred in not sustaining the demurrers and motions for directed verdict for insufficiency of the state's evidence. Those designated as accomplices were Lela B. Robertson, Hazel Whitehead, Floyd Chambless, and Ruth Clark.

A contraction of the 628 pages of sworn testimony reveals the following chain of sworn proof, documentary evidence, and circumstances decisive of this point. Mrs. Whitehead was employed by the Claude C. Arnold Chevrolet Company in Ardmore, Carter County, Oklahoma, on November 15, 1952, as office manager, and continued in such capacity until June 10, 1955. She had known defendant Heartsill all her life. Working under her direction as office help were Lela Robertson, Ruth Clark, Charlene Nall, and a Miss Carson. Mrs. Whitehead testified that about two weeks after she went to work for Mr. Arnold, he talked with her at a cafe on "B" Street in Ardmore. She said Mr. Arnold related he wanted to do some personal favors for a county commissioner, Mr. Paul Heartsill, and it would be necessary for him to have her cooperation. He told her, she said, he would have to handle the matter through his office. She said that Mr. Arnold, in substance, said Mr. Heartsill wanted to make payments on a pick-up truck, his personal automobile, and his son's automobile out of highway funds tapped through false claims for automotive parts supposedly purchased out of the highway funds of Carter County District 1, upon which claims would be approved by the county commissioners, warrants deposited to the agency account at the Exchange National Bank in Ardmore, credits would be made from time to time on Mr. Heartsill's payments to General Motors Acceptance Corporation (hereafter GMAC) the purchase financing agency of the Arnold Chevrolet Company, through the agency and remittances made by the agency to GMAC. She said that she in turn turned the matter over to Lela Robertson who handled it for her. Mrs. Whitehead further testified that from time to time such false purchase tickets were made up to cover payments on the said automobiles. The tickets would be prepared and attached to claims on Carter County District 1 highway fund. As outlined to her, the claim would be approved by Mr. Heartsill, county commissioner. She said these false claims were not posted on the agency books by the bookkeeper as accounts receivable. At times the claims were made out for more and sometimes for less than the amounts of the payments due on the cars. If the warrants in payment of the claims were more, the surplus would be held by Mr. Arnold to apply on the claims that were less than the amount due on the automobile payments. Sometimes the surplus was used to pay personal debts of Mr. Heartsill to the agency. This record is replete with instances of such false claims. We will not burden this opinion by detailing all of the transactions, but shall relate only a few characteristic ones.

For example, a payment of $590.01 was made for the rental of three trucks which had been purchased and paid for by Carter County. Mrs. Whitehead said this claim was made up by mistake by Charlene Nall. Before the warrant issued thereon had time to clear the bank, Mrs. Whitehead related, she contacted Mr. Heartsill and advised him there was plenty of time to stop payment. She said he told her he would take care of it. He did not stop payment and the warrant was paid, as reflected by the agency's bank deposit for February 9, 1954. She then asked Mr. Arnold how to handle it. She said she was informed by Mr. Arnold he would contact Mr. Heartsill and ascertain what to do about it. She left the amount of the warrant on Mr. Arnold's desk and he gave it to Miss Clark to keep.

On Sunday, December 12, 1954, (she testified Sunday was December 11) she and Ruth Clark were working in the office and Mr. Heartsill and Mr. Arnold came into the office. They wanted to know how much

Mr. Heartsill owed on his automobile. After much conversation, it was ascertained as twelve payments. Ten payments were partially made out of the $590.01 payment on the truck rental, which were received in the GMAC office in Oklahoma City, Oklahoma, as shown by their records, on December 14, 1954. At that time, a cash balance was being held by Mr. Arnold in the sum of $156.80, (see Mr. Burch's testimony hereafter) which had accrued from a false claim filed and paid the month before. The ten payments totalled $618.50. She said Mr. Heartsill decided to make only ten payments instead of twelve because, as he characterized the situation, "It would look a little fishy to pay the whole car out at one time." She said she told Mr. Heartsill that "the whole thing stinks to high heaven and we might as well go whole hog on it." The remainder of the surplus money was left on the counter and Mr. Heartsill pocketed it.

Mrs. Whitehead further testified the false tickets were made up in three copies. One was attached to the claim filed with the county, one placed in the Heartsill file, and she kept one. The one in the file and the one she kept were destroyed after the automobile payments were completed. This left only the copy of the false ticket attached to the claim in the county clerk's office.

Another example of payments out of county funds testified to by Mrs. Whitehead on Mr. Heartsill's automobiles was evidenced by exhibit eighteen. She said this false ticket was prepared by Mr. Chambless, manager of the parts department of the Arnold Chevrolet Co., the ticket number being 15144 in the amount of $172.60, for parts which were never delivered, but upon which a claim was filed in that sum and a warrant received therefor in payment, and credited to Heartsill's account.

Mrs. Whitehead testified that across the face of claim 4963 dated July 26, 1954, paid by warrant 2411 in the sum of $350.-40, she had written "August and September" and she testified this meant to her

the car payments for August and September for Mr. Heartsill's cars were to be made from the proceeds of this warrant.

Mrs. Whitehead related that the claims were signed by Lela B. Robertson, Charlene Nall, and Ruth Clark. The record affords ample evidence in support of her statements. She said they got their instructions from her and she got her instructions from Mr. Arnold. She related she knew the parts were not delivered because she saw the tickets made out, saw Mr. Coats, an employee of Heartsill, sign the tickets, and then walk out empty handed.

A similar transaction was testified to by Lela Robertson as evidenced by state's exhibit sixteen, false purchase ticket 37576 in the sum of $153.76, which Mr. Floyd Chambless made up.

Floyd Chambless testified that he made up other such false tickets for parts which were never delivered. One such false purchase ticket was contained in claim 3337 in the total sum of $174.44. Chambless testified that this false ticket was in his handwriting. He identified numbers of other such tickets as in his handwriting. Lela Robertson was able to identify this claim because she had written across its face "April and May" indicating to her Mr. Heartsill's car payments for these months were to be derived from this claim.

Ruth Clark testified that in September, 1954, Carter County owed on the agency books $619.97, but a warrant was received payable from the highway funds in the sum of $792.67. In November, she testified, Carter County owed on the agency accounts $360.44, but a claim for parts was filed for $517.24. The surplus did not appear on the Arnold Chevrolet accounts receivable. She testified she had seen Mrs. Whitehead write up car payments for Mr. Heartsill.

Charlene Nall, employed from June, 1954, until July, 1955, testified she was a cashier and stenographer. She said she typed up highway fund claims against Mr. Heartsill's District 1 from the charge tickets on file in the office. She said it

was customary for her to check them against the accounts receivable ledger. If there were more than was in the accounts receivable, she knew a false claim was included. She said she got her instructions from Mrs. Whitehead. All her entries on the accounts receivable ledger she made more easily identifiable by check marks opposite the entries in an open column one month and by x's the following month, and vice-versa. She said Mr. Heartsill was frequently in and out of the Arnold Chevrolet Company and made payments, sometimes, over the counter on his automobiles. Many other such false tickets and claims were identified by the foregoing witnesses.

The testimony of Mr. Burch of the State Examiner and Inspector's office and his findings are corroborative of the testimony of Hazel Whitehead, Lela Robertson, Charlene Nall, and Ruth Clark. He points out in vivid manner the differences in the Arnold accounts receivable and the claims filed with the county on which the warrants were issued and money paid in payment for the Heartsill automobiles. He related the discrepancies from January, 1954, through June, 1955, were as follows: claim 2515, filed January 26, 1954, for $318.55; amount shown on Arnold's books, $31.74, for a difference of $286.81: claim 3337, filed March 30, 1954, for $174.44; amount shown on Arnold's books, $20.68, for a difference of $153.76: claim 4234, filed June 1, 1954, for $480.88; amount shown on Arnold's books, $187.10, for a difference of $293.78: claim 4963 filed July 28, 1954, for $35v.40; amount shown on Arnold's books, $177.80, for a difference of $172.60: claim 1417 filed September 24, 1954, for $792.67; amount shown on Arnold's books $620.03, for a difference of $172.64: claim 1928 filed November 29, 1954, for $517.24; amount shown on Arnold's books, $360.44, for a difference of $156.80. This difference is apparently the $156.80 covered by Mrs. Whitehead's testimony in regard to the surplus used to complete the ten car payments December 12, 1954, in addition to the sum of $590.01. Claim 3157 filed March

7, 1955, $427.71; amount shown on Arnold's books, $164.48, for a difference of $263.23: claim 4409 filed June 6, 1955, $267.99; amount shown on Arnold's books, $147.54, for a difference of $120.45. This handful of facts constitutes a load of dynamite by way of corroboration.

The county clerk of Carter County, Jerry McCharen, testified as to the original documents in her office consisting of the claims, their form, and the method in which they were handled, and as to the warrants in payment thereof.

Mr. T. R. Reed testified to the GMAC records reflecting the ten payments made on December 12 and credited on December 14, 1954, on the Heartsill automobile and the other payments as to amount and date of payment.

On the question of whether the evidence is sufficiently corroborative of the accomplices' testimony and sufficient to connect Mr. Arnold and Mr. Heartsill with the crime, we are governed by the following rules: In Telman v. United States, 10 Cir., 67 F.2d 716, 717, certiorari denied 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500, it was said:

"It is true that there is no evidence of any formal agreement to do the acts charged, but that is not necessary. Conspirators do not put their agreements into writing, nor do they make public their plans. It is sufficient to show that the minds of the parties met in an understanding way so as to bring about an intelligent and deliberate agreement to do the act or acts charged, although such an agreement is not manifested by any formal words. Lawlor v. Loewe, 2 Cir., 209 F. 721, 725; Id., 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Stafford v. United States, 6 Cir., 300 F. 537; Burkhardt v. United States, 6 Cir., 13 F.2d 841; Goode v. United States, 8 Cir., 58 F.2d 105; Coates v. United States, 9 Cir., 59 F.2d 173. A mutual implied understanding is sufficient so far as the combination or con-

federacy is concerned, and the agreement is generally a matter of inference, deduced from the acts of the persons accused which are done in pursuance of an apparent criminal purpose. It is rarely susceptible of proof by direct evidence, and may be deduced from the conduct of the parties and the attending circumstances. Goode v. United States, supra; Murry v. United States, 8 Cir., 282 F. 617; Coates v. United States, supra; Symonette v. United States, 5 Cir., 47 F.2d 686."

There was ample evidence herein from which the conspiracy could be deduced. In Woody v. State, 95 Okl.Cr. 21, 238 P. 2d 367, 373, we said:

"This court has held that it is not necessary that the corroborating testimony be complete, independent proof of the crime, but if an accomplice's testimony is corroborated in part, the jury is then justified in believing the accomplice's entire story to be true."

In this connection, see Smith v. State, Okl.Cr., 278 P.2d 557, wherein in syllabi 1, 2, 3, and 4, we said:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime. It is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

"Where there is evidence in corroboration of an accomplice tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury.

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

To the same effect are Scott v. State, Okl.Cr., 316 P.2d 192, and Hardesty v. State, Okl.Cr., 291 P.2d 351, involving conspiracies to defraud as defined herein. Rushing v. State, 88 Okl.Cr. 82, 199 P.2d 614, written by the late Judge Barefoot announced the same rules governing such cases. In Plemons v. State, 53 Okl.Cr. 263, 10 P.2d 285, 287, in the body of the opinion, we said:

"The law prescribes no standard for the strength of corroborating evidence, and there is failure to corroborate only if their is no evidence legitimately having that effect."

There is an abundance of authority announcing these principles. We do not intend to say the foregoing cases are altogether in point on the factual situation, although two of them did arise out of frauds perpetrated by a county commissioner and one of his employees. Nevertheless, the principles are clearly applicable to the facts of the instant case. The jury believed the testimony of the accomplices in the conspiracy clearly established the connection of both Heartsill and Arnold with the conspiracy from its inception, and there is ample direct and circumstantial evidence to corroborate them. This is a matter of logical inference, more readily susceptible of deduction than not from all the acts of the parties which were done in pursuance of the apparent criminal purpose. Not only is the independent evidence sworn to by the GMAC representative, Mr. Reed; the county clerk, Jerry McCharen; Mr. Burch, auditor from the State Examiner and Inspector's office; Mr. Miller, of the Exchange National Bank, whose testimony was stipulated; but all the documents identified by them, such as claims filed in the county clerk's office, tickets attached thereto, bank deposit slips, etc., stand as irrefutable instruments of cor-

-roboration and point to the connection of both Arnold and Heartsill with this crime.

It would be most incredible, in face of this record, for the jury to believe Arnold and Heartsill were not connected with these many frauds. To repeat, just one circumstance tending to connect Arnold and Heartsill is the nefarious deal involving the rental trucks owned by the county on which rental payments in the sum of $590.01 were paid, which, together with part of the surplus sum of $156.80 held by Mr. Arnold, was applied on Mr. Heartsill's personal automobile purchases. This evidence is corroborated as to the $156.-80 by Mr. Burch's finding which reflects that a false claim was filed in November, 1954, as Mrs. Whitehead testified. The testimony of Mrs. Whitehead in relation to this transaction on December 12, 1954, is further corroborated by Mr. Reed of GMAC who testified ten payments in the sum of $618.50 were received and credited by GMAC in Oklahoma City on December 14, 1954, to Mr. Heartsill's personal automobile purchase account. This is all independent corroborating and connecting evidence.

Mr. Arnold is an astute business man, and the jury did not believe these things could go on nearly two years and Mr. Arnold not know of them. That too is a logical deduction. He claims he knew nothing about it. To believe this requires us to assume he was utterly indifferent to his business affairs. That too, is incredible. We are certain that this one thing would have brought him to grips with this fraud, even if he had not known of it at its inception; his observation of the discrepancies between the county warrants, deposited in the agency bank account, and his accounts receivable. We cannot believe the wide discrepancies could have escaped his observation. We are of the opinion the normal reaction, if he had not known of these transactions, when he was apprised thereof would have been for him to have called upon Mr. Heartsill for an explanation of these many fraudulent transactions and to have demanded restitution of him to the State. This he did not do. If such had been done it would have been competent in keeping with his defense. No such showing appears in this record. Instead, in keeping with guilty knowledge, he tries to beat the toll by making payments in the total sum of $4,980.80 in restitution, which his position now attempts to define as Mr. Heartsill's frauds. The inconsistency of this position is apparent.

Further corroboration appears in the testimony of Charlene Nall, who was not designated by the trial court as an accomplice. She testified it was customary for her, as she prepared the claims, to check them against the accounts receivable and if she came out with more tickets than were covered in the accounts receivable, she knew those not carried thereon were false. She said she got her instructions from Mrs. Whitehead. This evidence is not only clearly corroborative, but connective.

We need not burden this opinion with other circumstances tending to corroborate the accomplices and which point the connecting finger at both Arnold and Heartsill. We are of the opinion an ordinary view of this record supports the jury's findings.

In Plemons v. State, supra, on the question of the conduct of trial courts when confronted with the evidence on a motion for directed verdict, or a demurrer, the rule was stated as follows in syllabus 1:

"Trial courts in Oklahoma are limited in their power to interfere with the determination of issues of fact; and, where there are any facts from which the jury can legitimately deduce either of two conclusions, a motion to advise the verdict should always be denied, and the question of fact properly submitted under instructions given."

In the body of the opinion, Teague v. State, 13 Okl.Cr. 270, 163 P. 954, was quoted as follows:

"Where there is any competent evidence, reasonably tending to sustain the allegations of the information, the court should not sustain a demurrer to the evidence."

Baker v. State, 9 Okl.Cr. 47, 130 P. 524. Under this record it was therefore not error for the trial court to overrule the defendants' demurrers and motions for directed verdict, since the record reeks with evidence of guilt.

■■■■ Finally, it is contended the trial court erred in admitting incompetent and improper evidence. It clearly appears these objections are in relation to carbon copies of original records identified by Mr. Chambless as being in his handwriting, Arnold accounts receivable identified by Mrs. Clark as bearing evidence of her handwriting and made in the due course of business, original claims filed in the county clerk's office to which carbon copies of parts tickets were attached as part of the original county records, and a printed copy of the State Examiner's computations which were identified by Mr. Burch as having been made by him. All the foregoing consisted of duplicate originals, constituted primary evidence, and were identified by the parties making them as being authentic, hence this contention is wholly without merit. Each counterpart of an original instrument executed in duplicate or greater number and meant to be a true reproduction of the original copy, as herein, is primary evidence and admissible as a duplicate original. Reeves & Co. v. Martin, 20 Okl. 558, 94 P. 1058; Great American Life Ins. Co. v. Stephenson, 176 Okl. 295, 55 P.2d 56; Carter v. Carl Merveldt & Son, 183 Okl. 152, 80 P.2d 254. The permanent records of the county clerk consisting of claims duly identified as claims filed therein by Arnold Chevrolet Company with parts tickets attached were clearly admissible under the provisions of 12 O.S.1951 § 502. These documents, being official public records, were prima facie evidence of the facts therein stated. Powell v. Sandefur, 190 Okl. 54, 120 P.2d 365.

The Arnold records were obtained, as held by the trial court, through an agreement to exchange. Photostatic copies were made thereof as revealed by this record and the originals returned to Mr. Arnold the morning of the trial. Hereinbefore, Mr. Champion is quoted as saying these records could have been obtained by subpoena duces tecum, but such is not the case. In 22 C.J.S. Criminal Law § 706, p. 1199, the rule is stated:

"As a general rule, where a writing is in the possession or custody of accused, it is regarded as inaccessible to the state, as accused cannot be compelled to give evidence against himself by being required to produce it, and secondary evidence of the contents thereof is accordingly admissible."

Rocchia v. United States, 9 Cir., 78 F. 2d 966, 967; Watlington v. United States, 8 Cir., 233 F. 247; Trent v. United States, 8 Cir., 228 F. 648; McKnight v. United States, 6 Cir., 122 F. 926. We are therefore of the opinion this contention is wholly without merit.

■■■■ A plea for reduction of sentence is made herein, but this does not appeal to us. The jury did not even impose the maximum. As we said in Hardesty v. State, supra, 291 P.2d at page 368.:

" 'Those in public positions should maintain themselves with scrupulous fidelity to their cause. There is no place in our public affairs for officials without honor and integrity.' To this we add, a public official who breaches the trust imposed in him by the public will be held to the highest degree of accountability, to protect the public interest."

We go further and assert that all private citizens dealing with governmental officials in transactions involving the use of public funds should and will be subject to the severest scrutiny in such dealings and should expect no leeway from this Court, where it appears they lend their facilities to the perpetration of a fraud upon the

State, even though they derive no more than just a routine profit therefrom, as is the case herein. In no other way can those who cooperate in and engage in such evil practices be brought to justice. The judgment and sentence is affirmed.

POWELL, P. J., and NIX, J., concur.

On Rehearing.

PER CURIAM.

■ The contention is made on behalf of Claud C. Arnold, which the record supports, that he did not directly profit from the transactions alleged in the information. It is further urged, and supported by the record, that he personally made restitution to the state the sum of which it had been defrauded in these transactions.

In addition thereto, the record shows that Mr. Arnold has in the past made contributions to Ardmore and Carter County greatly in excess of any business profit he may have indirectly derived from these transactions. In this regard, it appears for many years he has furnished, without cost, to the 4-H Clubs of Carter County a new automobile for use in that worthwhile program. In fact, the record discloses he has responded to most all the community needs tending toward civic betterment.

All the foregoing conditions are referred to in a letter from the trial judge, Hon. Glenn O. Morris, to this Court. Finally, Judge Morris concludes:

"Undoubtedly, this defendant has suffered since his conviction great mental pain and anguish, probably more than is reflected by the verdict.

"In this case, I feel now that justice should be tempered with a little mercy. I would recommend that the one year imprisonment be commuted and that the $5,000.00 fine assessed by the jury ordered paid.

"Please do not feel that I am presumptious in writing this letter as it is intended merely as a suggestion and an expression of my feelings as a trial judge."

The prosecutor, Mr. Venters, has personally expressed himself to the Court as not being opposed to extension of mercy toward Mr. Arnold.

It is therefore the opinion of the Court that as to defendant Claud C. Arnold, the judgment and sentence should be modified to the payment of the $5,000 fine, otherwise the petition for rehearing is overruled. As to defendant Heartsill, the petition for rehearing is overruled and the judgment and sentence imposed by the trial court is to be enforced, both as to fine and imprisonment. It is so ordered.